416 So.2d 1337 (1982)
Shirley Mae DOYEN, et al., Plaintiffs-Appellants,
v.
The CESSNA AIRCRAFT COMPANY, et al., Defendants-Appellees.
No. 82-55.
Court of Appeal of Louisiana, Third Circuit.
July 2, 1982.
*1338 William N. Cox and Rex D. Townsley, Lake Charles, for plaintiffs-appellants.
Lunn, Irion, Switzer, Johnson & Salley, Charles W. Salley, Shreveport, Plauche, Smith, Hebert & Nieset, A. Lane Plauche, Raggio, Cappel, Chozen & Berniard, Chris M. Trahan, Oliver J. Schrumpf, Sulphur, Lugenbuhl, Lorzellene & Ellefson, Vance E. Ellefson and Russell D. Pulver, New Orleans, Camp, Carmouche, Palmer, Barsh & Hunter, David R. Frohn, Brame, Bergstedt & Brame, Frank M. Brame, Woodley, Barnett, Cox, Williams & Fenet, J. L. Cox, Jr., Lake Charles, Tommy C. Rutledge, DeQuincy, Stockwell & Associates, Fred H. Sievert, Lake Charles, for defendants-appellees.
Before CULPEPPER, SWIFT and LABORDE, JJ.
SWIFT, Judge.
Shirley Mae Doyen and her two children filed this wrongful death suit against numerous defendants, including The Cessna Aircraft Company (Cessna), Dorne & Margolin, Inc. (D&M), and Ideal Mutual Insurance Company (Ideal), following an airplane crash in which her husband, Fred B. Doyen, and her son, Kervin R. Doyen, were fatally injured. From judgments granting these defendants summary judgments, the plaintiffs have appealed.
On March 9, 1979, Mr. Doyen and Guy M. Corley made arrangements for the rental of a Cessna 172 airplane from Gene Allen Air Service, Inc. (Allen Air), for the next morning to perform local touch and go landings. The next day the two men and their sons, Kervin Doyen and Bryan Corley, took off in the plane from the DeQuincy airport. The aircraft was last seen on the runway at approximately 8 a. m. At that time the weather condition was overcast with fog, requiring the observance of instrument flight rules instead of visual flight rules. Neither Mr. Corley nor Mr. Doyen were certified to operate an aircraft under instrument flight rules.
When the plane had not come back around 10 a. m. a ground search was initiated. At approximately 12 or 12:30 p. m. the weather conditions improved and an air search attempted to locate the Cessna. About 5 p. m. the plane and its occupants were found about one-fourth to one-half miles from the airport. Evidently, the aircraft had struck a pine tree approximately 26 feet from the ground and crashed. When the rescue team arrived at the scene only Kervin Doyen was still alive. However, he died before reaching the hospital.
*1339 The aircraft was manufactured by Cessna and originally equipped with an Emergency Locator Transmitter (ELT) which had been manufactured by D&M. The purpose of an ELT is to transmit an emergency radio signal in the event of a crash to assist in locating the downed plane. However, the ELT unit had become inoperable and was removed from this aircraft prior to the accident.
On February 8, 1980, the present suit was filed alleging that the Cessna aircraft was defective and that the ELT manufactured by D&M and installed by Cessna in the plane was also defective. The petition further sets forth that Mr. Corley was the pilot of the aircraft and that he operated it negligently. In a supplemental petition the plaintiffs allege that Ideal issued Allen Air and/or O. J. Hunt[1] an insurance policy providing coverage to any persons, including Mr. Corley, using the aircraft with the permission of the insured.
The issues presented by this appeal are whether the trial court properly granted summary judgments to defendants Ideal, Cessna and D&M upon their motions.
In Thornhill v. Black, Sivalls & Bryson, Inc., 394 So.2d 1189 (La.1981), our supreme court said this in regard to motions for summary judgment in a products liability case:
"It is well settled that a motion for summary judgment should be granted if, and only if, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966; Employers' Surplus Line Ins. Co. v. City of Baton Rouge, 362 So.2d 561 (La.1978); Andrew Development Corp. v. West Esplanade Corp., 347 So.2d 210 (La.1977); Morgan v. Matlack, Inc., 342 So.2d 167 (La.1977); Stallings v. W. H. Kennedy & Son, Inc., 332 So.2d 787 (La.1976). Only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court is a summary judgment warranted. Employers' Surplus Line Ins. Co. v. City of Baton Rouge, supra; Andrew Development Corp. v. West Esplanade Corp., supra; Morgan v. Matlack, Inc., supra; Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976). The burden of showing that there is not a genuine issue of material fact in dispute is upon the mover for summary judgment. Any doubt is resolved against the granting of summary judgment and in favor of a trial on the merits to resolve disputed facts. Employers' Surplus Line Ins. Co. v. City of Baton Rouge, supra; Andrew Development Corp. v. West Esplanade Corp., supra; Morgan v. Matlack, Inc. supra; Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963)."
Such motions are not often sustained in tort suits. However, in Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976), the court said:
"Plaintiff relies strongly on Odom v. Hooper [273 So.2d 510 (La.)], supra, for his contention that contributory negligence cannot be decided on a motion for summary judgment. His reliance is misplaced; Odom v. Hooper should not be so interpreted. When the evidence submitted on the motion leaves no relevant, genuine issue of fact, and when reasonable minds must inevitably conclude that the mover is entitled to judgment on the facts before the court, the motion for summary judgment should be granted (C.C.P. 966), even if the defense is contributory negligence."
The test enunciated in Cates was applied by the supreme court in Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980), wherein it was held that an employer defendant was entitled to a summary judgment because "reasonable minds must inevitably conclude" that he was negligent in *1340 permitting an intoxicated employee (later injured in an automobile accident) to leave a company party.
This rule was followed and motions for summary judgment were granted in negligence cases by courts of appeal of this state in Cosse v. Schwegmann Brothers Giant Supermarkets, 336 So.2d 1074 (La.App. 4 Cir. 1976), LeBouef v. Montelius, 358 So.2d 332 (La.App. 4 Cir. 1978), Dore v. Cunningham, 376 So.2d 360 (La.App. 3 Cir. 1979), Johnson v. Edmonston, 383 So.2d 1277 (La. App. 1 Cir. 1980).
In Cosse now Justice Lemmon said:
"The summary judgment procedure is designed principally to decide issues of law in cases where the material facts are not in dispute. The procedure is therefore seldom appropriate in those negligence cases in which the decision turns on a determination of whether or not a defendant's conduct constitutes a tort, since such a determination almost always involves a factual dispute. Nevertheless, the procedure may be useful to one of multiple defendants in seeking dismissal, without a trial on the merits, after the operative facts of the accident have become fairly well established by investigation and discovery procedures. See Continental Cas. Co. v. McClure, 313 So.2d 260 (La.App. 4th Cir. 1975)."
And in Dore, a tort case involving a duty-risk analysis and causation, now Justice Watson said:
"While it is true that Dean Prosser describes causation as a jury question, the Louisiana Supreme Court has approved the granting of summary judgment even in contributory negligence cases where reasonable men could not differ. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La., 1976)."
Ideal's motion for summary judgment is based on the contention that its policy did not afford insurance coverage to Guy Corley for any damages caused by his negligent acts, even though he was using the aircraft with the permission and consent of the named insured, because at the time of the accident Corley was flying same under a rental agreement and was thereby excluded as an insured under an express provision of the policy.
It is undisputed that such insurance policy contained the following provisions:
"III. Definition of `Insured.' The unqualified word `Insured' whereever used in this Policy with respect to Coverage A, B, C and D, includes not only the Named Insured but also any person while using or riding in the aircraft and any person or organization legally responsible for its use, provided the actual use is with the permission of the Named Insured.
The provisions of this paragraph do not apply:
* * * * * *
"(c) to any person operating the aircraft under the terms of any rental agreement or training program which provides any remuneration to the Named Insured for the use of said aircraft. [Emphasis added.]
* * * * * *
"6. PURPOSE(S) OF USE: The aircraft will be used for the purposes indicated by `X':
* * * * * *
"X(c) `Limited Commercial'. The term `Limited Commercial' is defined as including all the uses permitted in (a) and (b) above and including Student Instruction and Rental to pilots but excluding passenger carrying for hire or reward;"
Gene Allen's deposition revealed that on March 9 Mr. Corley called Mr. Allen by telephone and stated that he and Mr. Doyen wanted to rent the airplane to do some local flying the next day. Allen refused, because the plane had already been scheduled for another flight. Afterwards Doyen arranged with Allen to rent the plane before the other scheduled flight.
The sole issue raised by the appeal from Ideal's judgment is whether the alleged pilot was an "insured" under the policy in question. The appellants argue that Paragraph 6(c) extends coverage to a rental pilot. We disagree.
*1341 In Jahrman v. Valley Air Park, Inc., 333 So.2d 712 (La.App. 2 Cir. 1976), writ denied, 338 So.2d 293 (La.1976), the court was confronted with a similar factual situation and issue. In that case plaintiffs' ancestor was fatally injured while a passenger in an airplane crash. The plane was rented from Valley Air Park and its liability insurer was granted summary judgment dismissing plaintiff's suit against it as the alleged insurer of the pilot. The policy contained the following provision:
"The unqualified word `insured' ... includes not only the named insured but also any person while using the aircraft... with the permission of the named insured. The provisions of this paragraph do not apply to:
* * * * * *
"(e) Any person, other than the named insured, while the aircraft is subject to any rental or lease agreement."
On appeal the plaintiffs argued, like in this case, that the policy was ambiguous when other sections such as those pertaining to "Use and Purposes" and "Coverage" were considered with the section defining "insured." Finding that each section of the policy served a different function and therefore must be construed accordingly the court concluded:
"We agree with the trial court's finding that no inconsistencies or ambiguities in the policy arise simply because different sections of the policy relate to `insureds,' `coverage,' `Use and Purposes' etc., each with its respective requirements and exclusions. One of the permitted uses of an aircraft under the policy is rental to others. Valley Air Park would be covered as to its liability but the person using the aircraft under a rental agreement would not be covered. The quoted provisions clearly state that they do not apply to any person, other than the named insured, while the aircraft is subject to any rental or lease.
* * * * * *
"Finding no ambiguity, we hold that a pilot who rents the aircraft from the named insured under the subject policy, is not an `insured' under the policy because of the definition of insured."
In the instant case we find no inconsistencies or ambiguities in the provisions of the policy in question. It is clear that the policy does not extend coverage to a person operating the aircraft under the terms of a rental agreement even though one of the permitted uses of the aircraft under the policy was "Rental to pilots." Since the plane had been rented by Allen Air to Messrs. Doyen and Corley for this flight, we conclude as a matter of law that the latter was not an "insured" under the policy because of the exclusion quoted above. The trial court therefore was correct in granting Ideal's motion for summary judgment as to liability for any acts of Mr. Corley.
Concerning the summary judgments as to Cessna and D&M, the law is well settled that "[a] manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by the defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." Thornhill v. Black, Sivalls & Bryson, Inc., supra.
In his deposition Frank Roth, an air safety investigator for the National Safety Board, stated that he investigated the crash on March 10, 1979, and did not discover any problems with the engine or aircraft. He found that the plane had fuel and there was no evidence of control malfunction. Mr. Roth said the plane had struck some pine trees approximately one-fourth of a mile south of the airport and traveled approximately 280 feet after the impact with the trees. He further testified that the ELT had been removed from the aircraft prior to the flight and such instrumentality had nothing to do with the operation of the aircraft.
*1342 The deposition of Siri Skare, a flight instructor for Allen Air, reveals that she was the last person that flew the Cessna before the crash. This flight occurred on March 9, 1979, and lasted approximately 48 minutes. On return the aircraft had 3.2 hours of fuel left in the tanks. Ms. Skare stated that before this flight she performed an extensive pre-flight inspection, including an inspection of the oil and fuel levels, the fuselage, flaps, elevator, tires, rudder, and propeller. She also made sure there was no obstruction in the air intake system. She further stated that had she found anything wrong the plane would have been grounded.
Gary Arthur, a mechanic licensed to work on air frames and power plants, testified in his deposition that on February 16, 1979, he performed a 100 hour inspection of the aircraft and found nothing wrong with the plane. However, the ELT had been removed previously. He also said that on a prior inspection he found the ELT inoperable and told either Mr. Allen or Mr. Hunt about it.
The affidavit of Larry Werth, a design engineer for Cessna, reflects that the ELT that was installed by Cessna in the aircraft was manufactured by D&M. On February 22, 1979, the Federal Aviation Administration (FAA) issued a directive requiring a modification of that type of ELT from lithium to alkaline batteries unless already done.
O. J. Hunt, the owner of the Cessna, said in his deposition that the ELT had been removed from the plane about October 20, 1978, and that he took it to Transit Aviation in Lake Charles where the battery modification kit was purchased.
Ronald Lovick's deposition reveals that he modified the ELT from lithium to alkaline batteries either in late December, 1978, or early February, 1979, but that it was still inoperable when he returned the unit. This is the reason it was not reinstalled in the aircraft.
Gene Allen, in his deposition, states that Mr. Lovick returned the ELT to him to have it repaired.
Jordan Fishbane, D&M's president said in his deposition that his company received the ELT from Allen Air without any instructions on February 12, 1979. The analysis and evaluation was completed on February 28. The printed circuits evidently had malfunctioned. The cost of repair was then quoted to and approved by the customer either on March 11 or 12. On March 19, 1979, the repaired unit was shipped to Allen Air by United Parcel Service. A new ELT could have been purchased at any time for approximately $220.00 and installed in the aircraft.
The regulations pertaining to ELT use are set forth in Part 91.52 of the Federal Aviation Regulations (14 CFR 91.52). Generally, they provide that no person may operate a U.S. registered civil airplane unless it is equipped with an operable ELT except in certain instances such as:
"(3) Aircraft while engaged in training operations conducted entirely within a 50-mile radius of the airport from which such local flight operations began;
"(10) An aircraft during any period for which the transmitter has been temporarily removed for inspection, repair, modification or replacement, subject to the following:
"(i) No person may operate the aircraft unless the aircraft records contain an entry which includes the date of initial removal, the make, model, serial number and reason for removal of the transmitter, and a placard is located in view of the pilot to show `ELT not installed.'
"(ii) No person may operate the aircraft more than 90 days after the ELT is initially removed from the aircraft."
The airplane's log reveals that no entry was made therein of the removal of the ELT and it is clear that no placard was placed in the cockpit to show there was no ELT installed. The aircraft was flown without an ELT on numerous occasions. The fatal flight took place more than 90 days after the ELT was removed.
The record is devoid of any dispute as to the facts related above.
*1343 From our review thereof we are convinced there is no genuine issue as to any material fact from which reasonable minds could conclude that the aircraft itself was defective. Its preflight inspection on March 9, 1979, revealed no indication of component malfunction and it functioned properly on that last flight before the fatal crash. The post-crash investigation also disclosed no evidence of engine or component malfunction.
Appellants' case is directed at the allegedly defective ELT and they argue that had it been repaired with due diligence after being forwarded to D&M, the aircraft would have been equipped with a working ELT which would have transmitted a signal upon the crash that may have enabled the rescue party to save Kervin Doyen's life or at least to reduce his pain and suffering.
In considering the motions for summary judgment of Cessna and D&M we must assume the correctness of the plaintiff's allegation that the inoperable ELT became defective in normal use. Nevertheless, we fail to see how a product that was not being used, even if defective, can give rise to liability under these circumstances.
It is, of course, obvious that an ELT has nothing to do with the flight or navigation of an aircraft. It is equally obvious that the inoperable ELT had nothing to do with causing the plane to crash in this instance. It is also clear to us that Cessna and D&M had no reason to believe that the owner or operator of the plane would permit its being flown without an ELT in any circumstance where it was required by Federal Aviation Regulations.
Actually, the Federal Aviation Regulations did not even require that the aircraft be equipped with an operable ELT for this local training flight. But even if they did, there was no reason for either Cessna or D&M to anticipate that upon the ELT becoming inoperable and being removed for repair the owner or operator of the plane would violate the regulation requiring the entry of such removal in the aircraft log and placing in the view of the pilot a placard showing that such instrumentality was not installed. In such case the pilot would then be in a position to determine whether or not it was proper for him to make a flight without it. And with respect to any delay by D&M in repairing and returning the ELT to Allen Air for reinstallation in the aircraft, there would be no reason for it to foresee that the plane would be flown on a flight requiring it and particularly more than 90 days after its removal from the plane in violation of the Federal Aviation Regulations.
Certainly there was less reason for Cessna and D&M to believe in this case that the plane would be flown in violation of the regulations than for the exonerated contractor in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (La.1972), to believe that the ladder which he left unattended leaning against the house would be moved by a third person to the ground where it caused the plaintiff to trip and fall. As the supreme court held in Lundin, we do not find that there was any duty on either Cessna or D&M to protect the decedents from the risk they encountered.
Furthermore, we do not find that such defect played "a significant and substantial role in causing" the injuries from which the plaintiff's relatives perished or any additional pain and suffering.
As stated in Dore v. Cunningham, supra, in regard to cause-in-fact in a duty-risk analysis of liability:
"To be a cause-in-fact, a cause must play a significant and substantial role in causing an injury, not a remote or slight part. Compare LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La., 1978). Cunningham's action was an unexpected, unforeseeable occurrence. It was the act of Cunningham and not his presence which caused the damage. We hold as a matter of law there is not `... sufficient causation between the [alleged] negligence and the injury to cast the defendant.' Frank v. Pitre, 353 So.2d 1293 (La., 1978)."
We are convinced that reasonable minds must inevitably conclude that this was an unexpected, unforeseeable occurrence and *1344 had either Cessna or D&M been guilty of any negligence with respect to the ELT it did not play a significant and substantial role in causing the tragic accident, the fatal injuries or pain and suffering resulting therefrom.
We therefore conclude that the trial court correctly sustained the motions for summary judgment filed by Cessna and D&M.
For the reasons assigned, the judgments of the district court appealed from are affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] The plane was actually owned by Mr. Hunt, who leased it to Allen Air for rental to qualified pilots.