477 So.2d 719 (1985)
Hazel Patricia CARROLL, as Tutrix, etc., Plaintiff-Appellant,
v.
NEWTRON, INC., et al., Defendant-Appellee.
No. 84-73.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1985.
Writ Denied May 13, 1985.
*720 Kronzer, Abraham, Watkins, Nichols, Ballard & Friend, by John R. Leach, III, Houston, Tex., for appellant.
William McLeod, Jr., Lake Charles, for plaintiff-appellant, Carroll.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Fred H. Sievert, Jr., Lake Charles, for defendant-appellee, Rosemount, Inc.
Homer C. Singleton, Jr., Lake Charles, for plaintiffs-appellants, Raymond and Ida Miller.
Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles, for defendants-appellees.
Mouton & Roy, Alan K. Breaux, Lafayette, for defendant-appellee, Badger and Sons.
Kathleen Manning, New Orleans, for defendant-appellant, Ralph M. Parson Co.
Raggio, Cappel, Chozen & Berniard, Thomas L. Raggio, Lake Charles, for defendant-appellee, Newtron.
John A. Jeansonne of Jeansonne, Briney & Goudelocke, Lafayette, for defendant-appellee, Johnson Controls, Inc.
Woodley, Barnett, Cox, Williams, Fenet & Palmer, J.L. Cox, Jr., Lake Charles, for defendant-appellee, Moore Products.
Dubuisson & Dubuisson, Edward B. Dubuisson, Opelousas, for defendant-appellee, Magnetrol Engineering.
Cox & Cox, James J. Cox, Lake Charles, for plaintiff-appellant, James K. Hedrick.
*721 Davidson, Meaux, Sonnier & McElligott, Richard C. Meaux, Lafayette, for defendant-appellee, Fisher Controls, Inc.
Jones, Tete, Nolen, Hanchey, Swift & Spears, Gregory P. Massey, Lake Charles, for defendants-appellants, Concoc, et al.
Before GUIDRY, FORET and LABORDE, JJ.
FORET, Judge.
This consolidated appeal is from judgments rendered by the trial court preliminary to a trial on the merits. Plaintiff filed suit against defendants for damages arising out of a fire which occurred at the CONOCO refinery, located in Westlake, Louisiana. Plaintiff, Hazel Patricia Carroll, brought a survival action and wrongful death action on behalf of her minor children, whose father died from injuries received in the refinery fire. Plaintiffs, Raymond and Ida Miller brought a survival and wrongful death action for the death of their son, Gary R. Miller. Plaintiff, James Kenneth Hedrick has sued defendants for personal injuries he sustained in the fire, and his wife, Lena Diane Bruette Hedrick, has brought suit for loss of consortium, service and society.
Preliminary to a trial on the merits, the trial court considered motions for summary judgment filed by all of the defendants in all three cases. For the purpose of hearing the motions for summary judgment, the three cases were consolidated.[1] The trial court granted summary judgments in favor of the following defendants: Bendix Corporation; Trip Alarm, Inc.; Rosemount, Inc.; Newtron, Inc.; Johnson Controls, Inc.; Ronan Engineering Company; Moore Products Company; Magnetrol International, Inc.; S.I.P. Engineering, Inc.; Fisher Controls, Inc.; E.B. Badger & Sons Company and its successor corporation, Stone and Webster Engineering Corporation. The court declined to grant summary judgments to CONOCO, Inc., CONOCO's insurer, the Hartford Accident & Indemnity Company, and the Ralph M. Parsons Company. Plaintiffs and third party plaintiffs-defendants, CONOCO, the Hartford, and Parsons[2], have appealed the summary judgments granted by the trial court with the exception of those granted to Bendix Corporation and Trip Alarm, Inc.
The court also granted an exception of no cause of action filed by Newtron, Parsons, CONOCO and the Hartford Accident & Indemnity Company, against plaintiff, Lena Diane Bruette Hedrick, which decision has been appealed.
By these appeals, we are asked to decide: (1) Whether the 1982 amendment to LSA-C.C. Art. 2315 allowing for damage for loss of consortium, service, and society should be applied retroactively; and (2) whether the trial court acted properly in granting summary judgments to defendants.

FACTS
During the early morning hours of October 1, 1980, a flash fire and explosion occurred in the fluid catalytic cracking (FCC) unit of the CONOCO refinery in Westlake, Louisiana. The evening before the fire, operators had been having problems with the refining process. Extra personnel had been called out and, although conditions were improved by eleven o'clock, the evening shift was held over. At about 1:30 a.m., a fire ignited in the FCC unit. Three of CONOCO's employees were injured in the fire. James Carroll and Gary Miller died as a result of burns they received that *722 morning and, James K. Hedrick suffered serious burn injuries.
The most intensive point of the fire was located near a drum known as a low stage knockout drum and the compressor which it serviced. At the time that the fire ignited, employees of CONOCO were draining excess liquid hydrocarbons which had accumulated in the low stage knockout drum. These liquid hydrocarbons were discharged through a drain on the bottom of the drum. Due to a modification in this drain, which consisted in the addition of an "L", the product did not flow into an inlet to the oily water sewer located directly beneath it but was diverted across the ground to a surface sewer some distance away. During the course of the draining, a substantial amount of liquid hydrocarbons collected in a pool on the ground. What ignited this accumulation of hydrocarbons is undetermined. What is known is that it ignited and that a flash fire of considerable proportions resulted.
The purpose of the low stage knockout drum is to prevent liquid hydrocarbons from reaching the compressor since the compressor can only accommodate gases and could be damaged by liquids. The low stage knockout drum is, itself, not designed to accept large amounts of liquids. The product which it receives comes from a drum known as the main frac reflux drum. Ordinarily, only vapors enter the line which runs from the main frac reflux drum to the low stage knockout drum. Any liquid which the low stage knockout drum receives is the result of condensation of these vapors. Prior to the fire, however, the level of liquid hydrocarbons in the main frac reflux drum was inordinately high, and liquid was, apparently, entering the line which ran from the main frac reflux drum to the low stage knockout drum. As a result, the level of liquid in the low stage knockout drum rose until it was so high that liquid hydrocarbons began to enter the compressor.
When liquid began to enter the compressor, an audible warning was given. Investigation by CONOCO employees revealed the high level of liquid in the low stage knockout drum. At this time, the compressor either shut down (as a result of a fail-safe system designed to prevent damage to it) or was shut down by CONOCO employees. In an effort to keep production going, employees of CONOCO began to drain the excess liquid from the drum by way of the L-shaped drain mentioned earlier. An investigation into the source of the excessive accumulation of liquid in the low stage knockout drum led to the discovery of the high level of liquid in the main frac reflux drum. CONOCO employees were still draining liquid hydrocarbons onto the ground when the fire ignited.

SHOULD THE 1982 AMENDMENT TO ARTICLE 2315 BE APPLIED RETROACTIVELY?
The trial court granted the exception of no cause of action filed by defendants Newtron, Parsons, CONOCO, and Hartford, dismissing Lena Diane Bruette Hedrick's claim for damages for loss of consortium, service, and society. We concur in this action of the trial court.
The fire which injured Mrs. Hedrick's husband occurred on October 1, 1980. It was not until 1982 that Article 2315 of the Louisiana Civil Code was amended to allow for recovery of loss of consortium, service, and society. Before this amendment, our courts had consistently held that spouses and children could not recover damages for loss of consortium, service, and society except in a wrongful death case. See Bourque v. American Mutual Liability Insurance Company, 345 So.2d 237 (La.App. 3 Cir.1977); Flateau v. Thom, 393 So.2d 392 (La.App. 1 Cir.1980); Mouton v. Armco, Inc., 425 So.2d 231 (La.App. 3 Cir.1982). It follows that this plaintiff can only maintain her action if the 1982 amendment to Article 2315 is retroactive. We have previously held that it is not. Ferguson v. Burkett, 454 So.2d 413 (La.App. 3 Cir. 1984). See also: Coates v. Owens-Corning Fiberglas Corp., 444 So.2d 788 (La.App. 4 Cir.1984). The trial court acted properly *723 when it granted the exception of no cause of action.[3]

SUMMARY JUDGMENTS
The rules governing summary judgments are well settled.
"[A] motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits show no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. C.C.P. Art. 966. Papers supporting the position of the party moving for summary judgment are to be closely scrutinized, while the opposing papers are to be indulgently treated. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981). A summary judgment is not appropriate when it is based upon affidavits and accompanying pleadings and other documentary evidence to establish subjective facts such as motive, intent, good faith or knowledge. Mecom v. Mobil Oil Corp., 299 So.2d 380 (La.App. 3rd Cir.1974), writ ref. 302 So.2d 308 (La.1974), Fontenot v. Aetna Insurance Co., 225 So.2d 648 (La. App. 3rd Cir.1969). Only when reasonable minds must inevitably concur is a summary judgment warranted and any doubts should be resolved in favor of a trial on the merits. Cates v. Beauregard Elect. Coop., Inc., 328 So.2d 367 (La. 1976); Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963); Clement v. Taylor, 382 So.2d 231 (La.App. 3rd Cir.1980).
[5] Nor is summary judgment appropriate as a vehicle for the disposition of a case, the ultimate decision in which will be based on opinion evidence or the judicial determination of subjective facts. Butler v. Travelers Ins. Co., 233 So.2d 271 (La.App. 1st Cir.1970); Smith v. Preferred Risk Mutual Ins. Co., 185 So.2d 857 (La.App. 3rd Cir.1966)."

Verrett v. Cameron Telephone Company, 417 So.2d 1319 (La.App. 3 Cir.1982), at pages 1322-23, writ denied, 422 So.2d 164 (La.1982).
"Nor is summary judgment intended to be used as a vehicle to circumvent trial of genuine issues even where it might appear to the court that the pleadings are frivolous and the party so pleading has little chance of success at trial. The denial of a pleader his day in court should be applied with caution in the interest of fairness and due process." Bernard v. Vidrine, 365 So.2d 525 (La. App. 3 Cir.1978), at page 526.
The defendants to whom the trial court granted summary judgments include: the manufacturers of instruments which made up the two alarm loops on the main frac reflux drum (Rosemount, Moore, Fisher, Ronan, Magnetrol), S.I.P., Johnson Controls, Newtron, Fisher, and E.B. Badger & Sons Company and its successor corporation, Stone & Webster.
Before we consider these defendants individually, we need to address the contention put forth by a number of them that they should be relieved of any liability they might otherwise have incurred by the intervening negligence of CONOCO's employees. They contend that the action of CONOCO's employees, by draining liquid hydrocarbons to the open air, constituted intervening negligence which excused any fault on their part. In essence, these defendants contend that any acts or omissions they may have committed were not the cause-in-fact of the fire.
A cause-in-fact is one which is a substantial factor without which the accident would not have occurred. Head v. St. Paul Fire & Marine Insurance Company, 408 So.2d 1174 (La.App. 3 Cir.1982), writ denied, 412 So.2d 99 (La.1982); Doyen v. Cessna Aircraft Company, 416 So.2d 1337 (La.App. 3 Cir.1982). In the present case, *724 all except two of the defendants[4] for whom the court rendered summary judgment are alleged to have committed some act or omission which resulted in the failure of the two alarm systems on the main frac reflux drum. From the evidence before us, it is clear that but for the failure of the alarm systems, the operators would have been alerted to the high level of hydrocarbons in the main frac reflux drum and could have alleviated the problem before it spread to the low stage knockout drum.
There are several methods of handling an excess of liquid in the main frac reflux drum. If the high level in the drum had been discovered timely, CONOCO's employees could have taken steps which would have prevented the build-up of liquid hydrocarbons in the low stage knockout drum. It is much more difficult to handle a high level of liquid in the low stage knockout drum. Although it is equipped with a blowpot designed to send liquids back to the main frac reflux drum, this blowpot has a small capacity. At any rate, it appears that by the time liquid hydrocarbons began to flow from the main frac reflux drum to the low stage knockout drum, the blowpot was entirely ineffective since the main frac reflux drum was so overburdened with liquids that it discharged any liquid sent to it by the blowpot back to the low stage knockout drum.
The two alarm systems were designed to prevent just the sort of problem that arose. The alarm systems should have warned the operators of the high level of liquid in the main frac reflux drum before liquid began to flow into the low stage knockout drum. The possibility that the low stage knockout drum might have been drained in the fashion in which it was drained was not unforeseeable. Despite the actions of CONOCO's employees, any fault of defendants which caused the failure of the alarm systems remains a substantial cause of the fire.
We will now proceed to a consideration of each of the defendants.

E.B. BADGER & SONS COMPANY, AND ITS SUCCESSOR CORPORATION, STONE & WEBSTER ENGINEERING CORP.
From 1951 through 1953, E.B. Badger & Sons Company was involved in renovation of a thermal catalytic cracking (TCC) unit at the Westlake refinery. This unit underwent two subsequent modifications in which Badger & Sons played no part. The first of these modifications occurred in 1971 and 1972. During this modification, a number of compressors were replaced by one large compressor and the low stage knockout drum was added. Although a drum similar to the low stage knockout drum had been part of the TCC unit designed by Badger & Sons, this drum, a gas/water separator, had not been located in the same area of the plant as the low stage knockout drum and, consequently, did not use the same drainage system. The portion of the underground oily water sewer which connected to the low stage knockout drum was designed by Parsons as part of the 1971-72 renovation. The second renovation occurred in 1978 and 1979. At this time, the main frac reflux drum was added.
Testimony indicated that the area where the fire occurred was part of a lake at the time that Badger & Sons did its work. The evidence is undisputed that Badger & Sons had no involvement with any instrumentality connected with the accident. Badger & Sons had completed its work some twenty-seven years before the fire. During these twenty-seven years, the TCC unit of the refinery had undergone extensive renovations. None of the hardware implicated in the fire was in existence at the time Badger & Sons finished its work. Badger & Sons was entitled to summary judgment.

*725 MANUFACTURERS OF THE INSTRUMENTS INCORPORATED INTO THE MAIN FRAC REFLUX DRUMS ALARM SYSTEMS
Defendants, Rosemount, Moore, Ronan, Fisher, and Magnetrol, all manufactured instruments which were components of the two alarm systems which were designed to warn the operators of high levels of liquid hydrocarbons in the main frac reflux drum. The high alarm system was made up of a differential pressure cell manufactured by Rosemount, a controller (to control the opening and closing of a valve) manufactured by Moore, an annunciator (a device which gives a visual and audible alarm) manufactured by Ronan, and a valve manufactured by Fisher. Besides warning of high levels of liquid with a flashing light and audible alarm, this system also opened and closed the Fisher valve to keep the liquid in the main frac reflux drum at the desired level (usually forty to fifty percent of the capacity of the drum). The instrument directly responsible for sending a signal to the valves was the Moore controller. The Moore controller was, itself, equipped with a warning light which should have alerted the operators of a high level of liquid. The other alarm system or loop designed to warn of high levels of liquid in the main frac reflux drum was the high high alarm system which consisted of a float device manufactured by Magnetrol and an annunciator manufactured by Ronan.
The failure of the alarm systems to go off is cited by plaintiffs as proof that one or more of the component instruments were defective. They further claim that the failure of the alarms to warn the operators caused the high level of liquid in the main frac reflux drum and as a result, the undetected development of a high level of liquid in the low stage knockout drum. They contend that this high level of liquid in the low stage knockout drum led to the draining of liquid hydrocarbons and the subsequent fire.
Because we feel that its position is unique, we will first consider defendant Fisher, whose valve was incorporated into the high alarm system. Fisher produced testimony which showed that its valve operated on a signal received from the Moore controller, and that its valve could only operate if the Moore controller registered a high level. CONOCO's operators testified that the Moore controller's warning light did not come on. Testimony indicated that the failure of the warning light on the Moore controller to light up meant that the Fisher valve was not receiving a signal from the Moore controller. This testimony indicated that given this failure of the Moore controller, the Fisher valve could not have operated even if it were in perfect operating condition on the night of the fire. Given this undisputed testimony, it is clear that the trial court acted properly when it granted Fisher's motion for summary judgment[5].
The position of the other manufacturers whose instruments were incorporated into the two alarm loops differs from that of Fisher. For each one, the issue of whether or not their product was defective remains in dispute. A manufacturer of a defective product is liable for any injury which that defective product causes.
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., *726 unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
... If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them...." (Citations omitted.)

Weber v. Fidelity & Casualty Company of New York, 259 La. 599, 250 So.2d 754 at pages 755-756 (1971).
In response to plaintiffs' allegations that the instruments they manufactured were defective, these instrument manufacturers have produced testimony which shows that some two months after the fire, loop tests were run on the high alarm and the high high alarm systems and that they were found to be functioning properly. In addition, they show that following the loop checks, the unit was started up and that the instruments have apparently been functioning properly ever since. For their part, the plaintiffs produced evidence which indicates that a component of one or more of the instruments might have been changed after the fire without a record existing of that change. Although none of the instrument technicians who were deposed remembered changing any components of these instruments, they testified that it was possible that one could have been changed, and the evidence indicates that there may have been other technicians, who were not deposed, and who might have changed a component of the instruments.
More importantly, plaintiffs have produced uncontroverted evidence that despite the presence of a high level liquid in the main frac reflux drum, the alarm did not produce an alarm. Even if we accepted the contention of the defendant instrument manufacturers that their instruments had not been changed or repaired after the fire and that they were properly functioning two months later, we would still have to reconcile this fact with the failure of the alarm system on the night of the fire. All of defendants' attempts to reconcile these two facts are speculative and insufficient to support the heavy burden that a party moving for a summary judgment must bear.
The alarm systems did not function on the night of the fire. The evidence before us does not answer the question as to the cause of this malfunction and leaves in dispute the question of which, if any, of the instruments incorporated into the two alarm loops were defective.
A party moving for summary judgment has the burden of showing that there is no dispute as to any genuine issue of material fact. Any doubt as to the existence of dispute will be decided in favor of the party opposing the motion. Chaisson v. Domingue, 372 So.2d 1225 (La.1979). With the exception of Fisher, defendant instrument manufacturers have failed to show that they were entitled to summary judgment.
Counsel for both sides have made much of the issue of who bears the burden of proofwhether plaintiff must prove which, if any, instrument was defective or whether each defendant instrument manufacturer bears the burden of showing that their product was free from defects. For purposes of a summary judgment, the question of who bears the burden of proof with regard to the substantive questions of the litigation is of little importance. The question of who bears the burden of proof is irrelevant if no genuine issue of fact exists. To say that no genuine issue of fact exists is to claim that nothing remains to be proved. In such a case, the question of who must muster the proof becomes irrelevant. For purposes of this appeal, the burden of proof which concerns us is the one which a party moving for a summary judgment bears. As we have said above, with the exception of Fisher, the defendant instrument manufacturers have failed to carry this burden and are, therefore, not entitled to summary judgments.

*727 S.I.P.
S.I.P. was involved in the engineering of the main frac reflux drum. Although the process design was done by CONOCO, this design had to be translated into mechanical drawings. At times, S.I.P. seems to argue that it, in essence, did nothing; that everything was done by CONOCO. Despite this, it is clear that the translation of CONOCO's process designs involved work that required considerable expertise, and not ruled out is the possibility that S.I.P.'s engineers could have made an error which resulted in the malfunction of the alarm systems. As Tom O'Grady, an instrument engineer for CONOCO, testified: "But as far as details and specific information to put on those drawings, to some extent they are left on their own (S.I.P.)." This discretion of S.I.P.'s included the exact placement of the instruments on the main frac reflux drum. O'Grady testified that the mechanical drawings were turned over to the manufacturer of the vessels, and that the vessels were built according to the drawings and the attachments and specifications that accompanied them. He testified "that these essentially [end] up dictating where the Magnetrol has to go at. There are no adjustments in the Magnetrol. You have to insure that you get it installed in the right spot within, you know, hopefully within an inch of where the process (process design) originally called for it ..."
If a contractor causes injury to a third party by the negligent performance of his work, he can be held to respond in damages to the injured third party. Williamson v. Gulf Coast Line Contracting Company, Inc., 301 So.2d 657 (La.App. 3 Cir.1974); Marine Insurance Company v. Strecker, 100 So.2d 493 (La.1957). From the depositions considered by this Court, it appears that the placement of the instruments on the tanks was important for their proper functioning and that S.I.P. played an important role in this placement. S.I.P. has not shown that it committed no legal fault in carrying out this responsibility. Whether or not S.I.P. performed its function properly is a genuine issue of material fact, and the trial court erred in rendering a summary judgment in favor of S.I.P.

NEWTRON
Newtron installed the instruments on the main frac reflux drum and wired them to the panel which they had installed in the central control room. Newtron also performed loop checks of the instrumentation and wiring.
As we have found above, the evidence before us leaves open the possibility that one or more of the instruments which made up the two alarm loops on the main frac reflux drum were defective. The testimony indicates that such a defect should have been discovered in the loop checks. Nevertheless, they were not discovered. Newtron was responsible for making these loop checks, and the possibility that they were negligent in performing these loop checks is not foreclosed by the evidence or affidavits before us. With respect to the liability of Newtron, an issue of material fact remained, and the trial court should not have rendered summary judgment for Newtron.

JOHNSON CONTROLS, INC.
Johnson Controls manufactured the panel in which the Ronan annunciator and Moore controller were installed. They also installed these instruments in the panel. Plaintiff contends that a defect in the panel or its fabrication was a cause of the malfunction of the two alarm systems on the main frac reflux drum. The panel manufactured by Johnson Controls was only a shell with cut-outs into which instruments were placed. None of the evidence indicates that the failure of the alarm loops was related to any defect in the panel itself. The evidence, however, leaves open the possibility that the malfunction of the two alarm loops may have been related to the installation of the instruments in the panel, in particular, the Ronan annunciators and the Moore controller. We know, from the evidence before us, that the alarm loops, part of whose instrumentation was installed by Johnson Controls, did not function *728 the night of the fire. Johnson Controls, however, argues that testimony indicated that after it installed the instruments on the panel, the instruments were checked by it, by CONOCO, and by Newtron. Despite this fact, we believe that a genuine issue of material fact still remains. Although Johnson Controls does muster strong evidence tending to show that they were free of fault, that does not mean that there is no genuine issue of material fact. The fact that evidence preponderates in favor of the party moving for summary judgment does not justify the denial of trial on the merits. Riviere v. Bethard, 422 So.2d 1341 (La.App. 3 Cir.1982). Plaintiffs must be given an opportunity to prove at trial on the merits that Johnson Controls' negligence in installing the instruments into the panel was the proximate cause of the fire.

DECREE
For the foregoing reasons, the judgments of the trial court rendered in this matter are affirmed in part and reversed in part as follows:
IT IS ORDERED, ADJUDGED AND DECREED that the motions for summary judgment filed on behalf of Fisher Controls, Inc. and E.B. Badger & Sons Company and its successor corporation, Stone and Webster Engineering Corporation, against plaintiff Hazel Patricia Carroll, as tutrix of her minor children, Kimberly Lynette Carroll, Kelly Monique Carroll, and Karla Gayle Carroll, and against all third party plaintiffs, are granted, and the plaintiffs' claims against the above named defendants are dismissed with prejudice.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the motions for summary judgment on behalf of defendants, Rosemount, Inc.; Magnetrol International, Inc.; Ronan, Inc.; Moore Products Company; Newtron, Inc.; S.I.P. Engineering, Inc.; and Johnson Controls, Inc., against plaintiff Hazel Patricia Carroll, as tutrix of her minor children and against all third party plaintiffs are hereby denied.
All costs at the trial level and of this appeal shall await final disposition of this matter.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] The other two cases are: James Kenneth Hedrick, Jr. and Lena Diane Bruette Hedrick v. Newtron, Inc., et al, (our docket number 84-74) and Raymond Miller and Ida Miller v. Rosemount, Inc., et al, (our docket number 84-75). This opinion will discuss all of the issues raised by the appeals brought in these three consolidated cases. For our opinions in these cases, see Hedrick v. Newtron, Inc., 477 So.2d 729 (La. App. 3 Cir.1985), and Miller v. Rosemount, Inc., 477 So.2d 730 (La.App. 3 Cir.1985).
[2] Although no third party demands were actually filed by CONOCO, the Hartford, and Parsons, it was agreed at a pre-trial conference that the trial court would recognize that all defendants were asserting third party claims against all other defendants.
[3] At oral argument, Mrs. Hedrick's attorney conceded that his client had no cause of action for loss of consortium, service, and society. Although only three of the defendants filed exceptions of no cause of action, under the powers granted this Court by LSA-C.C.P. Art. 2164, we will dismiss Mrs. Hedrick's action as to all defendants.
[4] These two defendants are E.B. Badger & Sons and their successor corporation, Stone and Webster. Because of the disposition which we make below, with regard to these two defendants, a more detailed discussion of this issue as it concerns these two defendants is unnecessary.
[5] In its brief, Ronan puts forth an argument similar to Fisher's, claiming that their annunciator was entirely dependent on the functioning of the Moore controller. This argument, however, ignores the fact that two Ronan annunciators were involved, one in the high alarm and one in the high high alarm. In the high high alarm loop, the only two instruments were the Ronan annunciator and the Magnetrol instrument, and there is no proof that the Magnetrol instrument was not sending a signal to the annunciator.